IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Robin Gamble *et al.* | : | |
| | : | Case No. 1:03-cv-452 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| Ohio Department of Job and Family | : | AND DENYING IN PART |
| Services *et al.* | : | SUMMARY JUDGMENT |
| | : | |
| Defendants. | : | |

This matter comes before the Court on the joint Motion for Summary Judgment of

Defendants Hamilton County Department of Job and Family Services ("HCDJFS") and HCDJFS

Director Suzanne Burke (collectively, "County Defendants") (doc. #25). For the reasons set

forth below, County Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

This controversy stems from an intertwined set of state and federal public assistance, or

welfare, programs. Plaintiffs Robin Gamble, Glynnis Willis, Linda Marcum, April Rogers, and

Kathryn Swope-Miller (collectively "Plaintiffs") are all Ohio parents who received public

assistance at some point in time. They brought this 42 U.S.C. § 1983 action against County

Defendants and the Director of the Ohio Department of Job and Family Services (ODJFS)[1]

---

[1] Plaintiffs' complaint also named ODJFS itself as a Defendant. The Court has since
concluded that state sovereign immunity bars all claims against ODJFS. (See doc. #34.)

1

(collectively "Defendants"), alleging that Defendants have violated their federal statutory and procedural due process rights by withholding, in violation of governing law, certain child support payments Plaintiffs had temporarily assigned to the State as a condition of receiving public assistance.

Ohio participated in the federal Aid to Families with Dependent Children ("AFDC") program and continues to participate in its successor, the Temporary Assistance for Needy Families ("TANF"), established by Section IV-A of the Social Security Act ("Act").  See  42 U.S.C. §§ 601 et seq.  To obtain federal funds through these programs, Ohio must certify that it will operate a child support enforcement and distribution program that conforms with the requirements set forth in Title IV-D of the Act, 42 U.S.C. §§ 651 et seq. and Ohio Administrative Code § 5:101:1-29-31.  (Doc. #46 at 1-2.)  Any prospective public assistance recipient who has the right to collect child support must assign his or her rights to Ohio and cooperate with Ohio's efforts to obtain payment as a condition of receiving assistance.  42 U.S.C. § 608(a)(3)(A).  Under what the parties refer to as the "Family First" provisions of the Act, any child support collected while the recipient's family is on public assistance is transmitted to the State of Ohio and then either passed on to the federal government or retained by the State. See 42 U.S.C. § 657(a)(1)(A) and (B).  Most significantly for this case, the Family First rules provide that the total amount of child support ultimately paid to the federal government and/or retained by the State must not exceed the total amount of public assistance paid to the family by the State.  Id.

While the Family First rules are theoretically simple, their administration is complex.  As a practical matter, accrued child support arrearages often remain assigned even after a family

2

leaves public assistance.  The Act provides that for assignments entered into before October 1,

1997, the family assigns to Ohio all rights to support that previously accrued and will accrue

prior to the family leaving public assistance.  (Doc. #3, exh. A at 8 § IV(a)(1).)[2]  For assignments

entered into on or after October 1, 1997 but before October 1, 2000, the family assigns to Ohio

all rights to support that accrue while the family is on public assistance and temporarily assigns

to Ohio all rights to support that accrued prior to the family going on public assistance until the

later of October 1, 2000 or the date the family ceases receiving assistance.  See 42 U.S.C. §§

657(a)(2)(B)(i)(II)(aa) and (bb);  42 U.S.C. § 657(a)(2)(B)(ii)(II)(aa) and (bb).  For assignments

entered into on or after October 1, 2000, the family assigns to Ohio all rights to support that

accrue while the family is on assistance and temporarily assigns to Ohio all rights to support that

accrued prior to going on public assistance, until the family leaves public assistance.  Id.

Arrearages collected on or after October 1, 1997 are first distributed to the family in the amount

of arrearage that accrued after the family left public assistance or before the family received

public assistance.  Id.  Remaining arrearages go to the federal government and/or the State to

cover unreimbursed public assistance costs.  Id.

The Ohio Department of Job and Family Services ("ODJFS") is the state agency charged

with administering and supervising Ohio's child support enforcement program.  Ohio law further

mandates the creation of *county* departments of job and family services ("CDJFSes") and county

child support enforcement agencies ("CSEAs"), to administer child support enforcement at the

---

[2]The Office of Child Support Enforcement ("OCSE") within the Department of Health
and Human Services ("HHS") oversees this complicated federal-state public assistance-child
support enterprise.  Exhibit A to doc. #3 is the set of instructions from OCSE to the ODJFS and
other Ohio agencies administering a Title IV-D approved child support enforcement program.

local level.[3] See Ohio Rev. Code. §§ 329.01; 3125.24. Defendant Hamilton County Department of Job and Family Services ("HCDJFS") is the CSEA within Hamilton County, see Ohio Rev. Code § 3125.11, and as such is charged with collecting and transmitting county child support collections to ODJFS for distribution. (Doc. #46 at 3.) In 2000, ODJFS began implementing a new statewide child support collection and distribution system–the Support Enforcement Tracking System ("SETS")–in accordance with the requirements of 45 C.F.R. § 307.5(a). (Doc. #1 at 6 ¶ 12; doc. #14 at 2 ¶ 12; doc. #46 at 2.)[4]

Plaintiffs sued ODJFS, HCDJFS and the agencies' respective directors[5] in June 2003, alleging that Defendants[6] have failed to calculate child support arrearages properly, and, as a result, have retained child support payments to which they are not entitled under the guise of recouping public assistance benefits. (Doc. #1.) They contend that Defendants have thus violated Plaintiffs' procedural due process rights, as well as certain common-law fiduciary duties owed Plaintiffs. (Id. at 10.) Plaintiffs ask the Court to order Defendants to transmit all owed and

---

[3] In Hamilton County, the CSEA is within HCDJFS. (Doc. #25 at 5 n. 3.) However, it is unclear from the record whether this precise relationship is replicated in other Ohio counties. Id.

[4] During this time, ODJFS decided to waive all assigned arrearage amounts for child support assignments executed after September 30, 1997 and transferred to SETS on or before October 1, 2000. (Doc. #46 at 3.)

[5] After Plaintiffs' lawsuit was filed, Barbara Riley replaced Tom Hayes as ODJFS Director. (See Doc. #63 at 1 n. 1.) Summary judgment motions filed on behalf of both Riley and Hayes are also pending before this Court and will be addressed in a separate Order. (See docs. ##s 36, 63 and note 9, infra.)

[6] Plaintiffs' complaint broadly alleges that "Plaintiffs . . .are owed child support arrearages by Defendants." (Doc. #1 at 3 ¶ 3.) However, its factual allegations of over-withholding by *HCDJFS* appear to pertain to only three of the five named plaintiffs: Robin Gamble, Linda Marcum, and Glynnis Willis. (Id. at 3-5.) With respect to the other plaintiffs–Kathryn Swope-Miller and April Rogers–the complaint alleges over-withholding by, respectively, the Lucas and Clermont County Departments of Job and Family Services (Id. at 4.)

4

due child support arrearages to Plaintiffs and to order Defendants to pay compensatory and punitive damages to Plaintiffs. (Id. at 13.) Plaintiffs also seek a declaratory judgment that Defendants' conduct violated and continues to violate the "Constitution and laws of the United States,"[7] and injunctive relief ordering Defendants to assist Plaintiffs with child support account audits.[8] (Id. at 13.) Finally, Plaintiffs ask the Court to certify statewide plaintiff and defendant classes so that other, allegedly similarly injured individuals in Hamilton and other Ohio counties may collectively audit and recover their own arrearages from the relevant agencies. (Doc. #1 at 8 ¶ 18, 9 ¶ 26, and 12; see also docs. ##s 10-11.)

In June 2004, the Court dismissed all Plaintiffs' claims against ODJFS as barred by the Eleventh Amendment or state sovereign immunity doctrine. (Doc. # 34.) However, the Court found that Plaintiffs could continue to seek declaratory and injunctive relief against the ODJFS Director, then Tom Hayes, in his official capacity pursuant to the exception established in Ex Parte Young, 209 U.S. 123 (1908). (Doc. #34 at 7.) The remaining Defendants–current ODJFS Director Barbara Riley, HCDJFS, and HCDJFS Director Suzanne Burke–have since moved for

---

[7] As noted above and in Plaintiffs' complaint, the Family First rules are implemented in part through Ohio law. (See doc. #1 at 6 ¶ 10). Plaintiffs allege that they have a "property right, created by federal and state statutory provisions and regulations, including but not limited to 42 U.S.C. §657(a)," to the allegedly over-withheld arrearages. (Id. at 10 ¶ 37.) Plaintiffs also allege that Defendants were "acting under color of state law," in apparent reference to one of the threshold criteria for applying § 1983. (Id. at 10 ¶ 38). However, the complaint does not cite any specific provisions of Ohio law in connection with its causes of action or prayers for relief. (See id. at 10-13.)

[8] The Court has already enjoined the ODJFS Director from "recouping erroneous overpayments from Plaintiffs' subsequent child support payments" absent either explicit consent of the Plaintiffs or a Court order awarding the disputed payments to Defendants, and ordered the director to allow Plaintiffs electronic access to ODJFS' system so that they may conduct audits of their personal account records. (See docs. ##s 38, 46, 74.)

summary judgment.  (See docs. ##s 25, 36, 63.)  This Order concerns only the joint motion for summary judgment by HCDJFS and HCDJFS Director Burke (doc. #25).[9]

## II.      JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343. Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the moving party has the burden of showing that there exists no genuine issue of material fact, and the evidence–together with all inferences that can permissibly be drawn from that evidence–must be read in the light most favorable to the party opposing the motion.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.  While the initial burden on summary judgment rests with County Defendants, Plaintiffs cannot defeat a properly supported defense motion with conclusory assertions or allegations.  Harris v. Adams, 873 F.2d 929, 931 (6th Cir. 1989); McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990) (internal citations omitted).  Rather, Plaintiffs must present "some significant, probative evidence" on disputed issues in order to preserve those issues for trial.  Harris, 873 F.2d at 931.

---

[9] The motions by former and current ODJFS Directors Hayes and Riley (docs. ##s 36, 63) will be addressed separately, as will Plaintiffs' motions for class certification (docs. ##s 10-11) and interim fees and costs (doc. #52).

### III.    ANALYSIS

In their Motion, County Defendants assert four major grounds for relief.  As threshold matters, they contest this Court's personal jurisdiction (doc. #25 at 3), and contend that–like ODJFS–they are entitled to state sovereign immunity from suit (id. at 4-12).  County Defendants further argue that Plaintiffs have failed to state any claim upon which relief can be granted under 42 U.S.C. § 1983 (id. at 13-18), and that the statute of limitations has run on any otherwise proper claims (id at 12-13).

For the reasons below, the Court concludes that County Defendants are entitled to state sovereign immunity with respect to all Plaintiffs' claims against HCDJFS and Plaintiffs' claims for retrospective monetary relief from HCDJFS Director Suzanne Burke.  The Court therefore **GRANTS** summary judgment to County Defendants as to those claims.  However,  the Court **DENIES** summary judgment to County Defendants on Plaintiffs' claims for prospective injunctive or declaratory relief against HCDJFS Director Burke.

### A.    Lack of Personal Jurisdiction

County Defendants first challenge this Court's personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), arguing that HCDJFS is "not a legal entity with the capacity to be sued."  (See Doc. #25 at 3.)  By way of support, they reason that under Ohio law, HCDJFS is merely an "instrumentality of the Hamilton County Board of Commissioners," and HCDJFS Director Burke a County employee.  (Id.; doc.  #25 at 10; see also O.R.C. §§ 329.01 and 2744.01(B), (F)).

The Court finds nothing in County Defendants' cited Ohio code sections that obviously limits its jurisdiction over HCDJFS and its Director.  Indeed, other courts in this Circuit have

7

recently asserted jurisdiction over HCDJFS and other Ohio County Departments of Job and

Family Services. See, e.g., Hurston v. Butler Cty. Dept. Of Job and Family Servs., No. 1:01-cv-

313, slip op., 2005 WL 2416566 (S.D. Ohio Sept. 30, 2005); Denton v. Bedinghaus, No. 00-4072,

2002 WL 1611572 (6th Cir. July 19, 2002). Nevertheless, the Ohio Supreme Court has held that

in state actions involving county departments like HCDJFS, "the county is the real party in

interest." Wilson v. Stark Cty. Dept. Of Human Servs., 63 N.E.2d 105, 108 (Ohio 1994).[10] On

balance, therefore, the Court agrees that Plaintiffs' action against HCDJFS and Director Burke is

probably better characterized as an action against Hamilton County and its officials or employees.

This finding alone, however, does not entitle County Defendants to summary judgment.

The Sixth Circuit has emphasized that "no action shall be dismissed on the grounds that it has not

been prosecuted in the name of the real party in interest" until the opposing party has had a

reasonable opportunity to make the appropriate substitutions. Zurich Ins. Co. v. Logitrans Inc.,

297 F.3d 528, 531 (6th Cir. 2002); see also Knight v. New Farmers Nat'l. Bank, 946 F.2d 895, No.

90-6071, 1991 WL 207056, at **1-2 (6th Cir. Oct. 15, 1991) (unpublished) (vacating grant of

summary judgment where district court identified real party in interest other than current

defendant but did not allow plaintiffs the opportunity to substitute parties). Because Defendants

first raised this defense in their answer, see doc. #14 at 5 ¶ 62, Plaintiffs have already had ample

time to move to substitute Hamilton County for HCDJFS. Plaintiffs' failure to so move is not

materially prejudicial, however, in that–by County Defendants' own characterization–HCDJFS is

_____

[10] Wilson involved a county department of *human* services. Id. However, "human
services," in this context, appears interchangeable with "job and family services." See, e.g.,
Dever v. Casbeer, No. C-050106, 2005 WL 2899631, at *1 n.1 (Oh. App. 1st. Nov. 4, 2005)
(noting that "the Hamilton County Department of Jobs and Family Services has alternatively
been referred to as the Hamilton County Department of Human Services throughout this
litigation.")

an instrumentality of the Board and is already represented in this action by County counsel.  (See

doc. #25 at 3; doc. #30 at 3-4.)  The Court therefore **DENIES** County Defendants' claim for relief

on this ground.[11]

> **B.**     **State Sovereign Immunity from Suit**

County Defendants next argue that they are immune to Plaintiffs' suit as a matter of

federal and state law, citing both the Eleventh Amendment to the federal Constitution and

Chapter 2744 of the Ohio Revised Code.  (See doc. #25 at 4-12).  Because immunities created by

state law have no force in actions brought under 42 U.S.C. § 1983, see generally Howlett v. Rose,

496 U.S. 346 (1990), the Court limits its analysis to state sovereign immunity under the Eleventh

Amendment and associated doctrines.[12]  Under these doctrines, County Defendants have the

burden of showing HCDJFS and its Director constitute an "arm of the state" of Ohio, and are

therefore entitled to immunity.  Gragg v. Kentucky Cabinet for Workforce Dev., 289 F.3d 958,

963 (6th Cir. 2002); Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997); Mt. Healthy Sch.

---

[11] Plaintiffs, if they so choose, may move for an appropriate substitution pursuant to Rule 15(a).  See Fed Rule Civ. Proc. 15(a).

[12] As a formal matter, state sovereign immunity is not strictly limited to the terms of the Eleventh Amendment proper; rather, it "flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution."  Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005) (citing Alden v. Maine, 527 U.S. 706, 713-14 (1999)).  Nevertheless, the term "Eleventh Amendment immunity" is often used as a shorthand for state sovereign immunity.  See, e.g., Brotherton v. Cleveland, 173 F.3d 552, 558-562 (6th Cir. 1999).  In light of this practice, and Defendants' obvious reliance on cases in the Ernst line, the Court does not construe Defendants' state sovereign immunity claim as solely grounded in the Eleventh Amendment.  At the same time, there is an established distinction between state sovereign immunity, which covers public entities and officers of those entities who qualify as "arms of the state," and other qualified or absolute immunities that may be available to public officers in their individual or personal capacities.  See, e.g., Brotherton, 173 F.3d at 559-62; Hutsell v. Sayre, 5 F.3d 996, 1002-03 (6th Cir. 1993).  The Court does not read County Defendants' motion to present these latter defenses, which fall outside the purview of the Eleventh Amendment, see Hutsell, 5 F.3d at 1003, and thus limits its analysis to state sovereign immunity.

Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). Ohio county CSEAs are traditionally

regarded as municipal entities or "political subdivisions" of the state rather than as state entities.

See, e.g., Denton, 2002 WL 1611472, at **4 (describing defendants including Hamilton County

Child Support Enforcement Agency as "municipalities"); Dever v. Casbeer, No. C-050106, 2005

WL 2899631, at *3 (Oh. App. 1st. Nov. 4, 2005) (describing HCDJFS as a "municipality").

Municipal entities are entitled to state sovereign immunity only to the extent that, through their

activities in the relevant area, they serve as an "arm" or "alter ego" of the state. Mt. Healthy, 429

U.S. at 280; doc. #47 at 2-4. The same essential analysis applies to municipal officials, with one

important exception addressed later in this Order.[13] See, e.g., Pusey v. City of Youngstown, 11

F.3d 652, 657-68 (6th Cir. 1994); Hutsell v. Sayre, 5 F.3d 996, 999 (6th Cir. 1993).

An entity or official's status as an "arm of the state," as opposed to a mere "political

subdivision" of the state,[14] turns on several factors.[15] Ernst v. Rising, 427 F.3d 351, 359 (6th Cir.

---

[13] As the Court has recognized in its prior orders, sovereign immunity for entities is broader than sovereign immunity for officials in that the latter are not shielded from claims for prospective and/or injunctive relief. See doc. #34 at 6-7 (citing in part Ex Parte Young, 209 U.S. 123 (1908) and Part III.B.5, infra.

[14] See Mt. Healthy, 429 U.S. at 280 (citing O.R.C. § 2743.01).

[15] In September 2004, shortly before this case was temporarily reassigned to another judge, this Court directed County Defendants to supplement their initial briefing on the sovereign immunity issue discussed at Part III.B below. (See doc. #47 at 3-4.) The Court considers County Defendants' responsive memorandum (doc. #50), filed in October 2004, along with the initial briefs. In October 2005, County Defendants submitted a second supplemental memorandum drawing the Court's attention to the Sixth Circuit's short unpublished opinion in Peyton v. Village of Fairfax, Nos. 04-3367/3741 (6th Cir. April 29, 2005). (Doc. #75). Plaintiffs argue that Peyton, to the extent it binds the Court, is legally distinguishable. (Doc. #76.). The Court does not find Peyton–which involves a different factual situation, and does not individually analyze the sovereign immunity factors–particularly instructive.

2005).[16]  The Court must consider (1) the state's prospective financial liability for any money judgment against the entity; (2) state characterization of and control over the entity, as expressed through state statutes and case law; (3) state appointments of an entity's leaders or other board members; and (4) the extent to which the "entity's functions fall within the traditional purview of state or local government."  Id. (citing in part Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44-51 (1994)).  The first factor–potential state liability–carries the most weight.  Id.

### 1.    Potential State Liability for Judgments Against County Defendants

In evaluating Ohio's prospective state liability for a judgment against Defendants, the relevant inquiry is not whether any monetary award against HCDJFS and Burke would *necessarily* be paid out of the Ohio Treasury.  Ernst, 427 F.3d at 359-60; see also Doe, 519 U.S. at 431.  Rather, it is whether the State could realistically be called upon to fund a shortfall in the event that HCDJFS had insufficient internal assets or other financial resources–such as insurance or indemnification provisions–with which to satisfy such an award.  Ernst at 359-60; see also Doe, 519 U.S. at 431, and Hess, 513 U.S. at 50.  Where "as a practical matter, if [an] agency is to survive, a judgment must expend itself upon state treasuries, common sense and the rationale of the [E]leventh [A]mendment require that sovereign immunity attach to the agency." Hess, 513 U.S. at 50 (quoting Morris v. Washington Metro. Area Transit Auth., 781 F.2d 218, 227 (D.C. Cir. 1986)).

County Defendants contend that it is clear from the face of the Family First rules that the State would ultimately be liable for any monetary relief sought by Plaintiffs in this case.  (Doc.

---

[16] Ernst was decided after County Defendants' motion had been fully briefed.  The papers discuss the test set forth in Brotherton, 173 F.3d at 560, which the Sixth Circuit has recognized as substantially analogous to the one presented in Ernst.  See, e.g., Ernst, 427 F.3d at 359.

#25 at 8.) They note that under the rules, any child support HCDJFS collects on behalf of a public assistance recipient must ultimately be transmitted to the State so that the State may transfer it to the federal government, retain it, or distribute it to the recipient family as appropriate. (Id., citing 42 U.S.C. § 657(a).) Apart from proceeds of the two-percent administrative fees it levies on each support order, HCDJFS apparently has not retained any arguably contested funds. (See Doc. #50 at 10.) Defendants also contend that HCDJFS generally acts as an "agent of the state" in distributing federal and state public assistance funds. (Doc. #30 at 4.) From these facts, Defendants conclude not only that the Ohio Treasury would ultimately fund any judgment against HCDJFS or its Director for violation of the Family First provisions, but also that "*any* claim that may exist" under the Family First provisions must lie against the State itself. (Doc. #30 at 2 (emphasis added).) Plaintiffs concede that HCDJFS' child support collections flow to the State, but argue that this fact alone does not obligate Ohio to pay any § 1983 constitutional tort damages ordered against County Defendants, and therefore does not entitle County Defendants to immunity absent other authority for that immunity. (Doc. #29 at 5-7.)

In certain respects, both parties' arguments miss the mark. County Defendants are incorrect to the extent they mean to imply that potential state liability, for sovereign immunity purposes, is co-extensive with a consideration of the financial mechanics of the statutes Plaintiffs contend have been violated. While these mechanics may certainly *inform* the question of whether a given entity is entitled to sovereign immunity, particularly as regards the state-control factor, see Part III.B.2, infra, the Court does not understand the state-liability analysis to be so limited. See, e.g., Ernst, 427 F.3d at 359-60 (relying, in finding State potentially liabile for judgments against judicial retirement system, on an analysis of appropriation provisions not at issue in

12

underlying suit). In fact, as County Defendants ultimately concede, the State "may well contest" its duty to pay any *judgment* levied against HCDJFS and its Director for their alleged miscalculations of child-support arrearages, even if–as it currently appears–the underlying child support payments have all been legally assigned and transferred to ODJFS. (Doc. #50 at 9; <u>see also</u> 42 U.S.C. §608 (requiring assignment of child support collection rights to the state)).

Plaintiffs, for their part, suggest that the State cannot be prospectively liable for judgments against County Defendants unless such liability is mandated in specific provisions of law. Plaintiffs read the sovereign immunity doctrine too narrowly. As discussed above, the fact that Ohio would not *necessarily* be required to pay any monetary judgment against HCDJFS or its Director is not dispositive in the sovereign immunity analysis. <u>See, e.g.</u>, <u>Doe</u>, 519 U.S. at 430-31 (finding state potentially liable for judgment against the University of California, and the University therefore entitled to state sovereign immunity, despite fact that any damage award in instant case would be paid by the *federal* government pursuant to an indemnification agreement). As the Supreme Court has emphasized, there is much more to the state-liability inquiry than the "formalistic question of ultimate financial liability." <u>Id</u>. at 431; <u>Ernst</u>, 427 F.3d at 362-64.

Here, the Court detects few of the elements the Supreme Court and Sixth Circuit have recently emphasized in refusing to extend–on state-liability grounds–state sovereign immunity to smaller entities. In <u>Hess</u>, the Supreme Court emphasized the state-liability factor in denying sovereign immunity to a bi-state port authority. It emphasized that the authority was funded primarily by private investors and statutorily barred from drawing directly on state tax revenues or credit. <u>Hess</u>, 513 U.S. 30 at 36-37. The host states' legislatures had passed specific appropriations funding some authority expenses, but these appropriations were "modest" in comparison to the authority's overall budget. <u>Id</u>. at 37-38. The Court suggested that while the

13

authority's host states could always *choose* to cover the cost of any judgments levied against the authority, this was a very remote possibility because the authority was clearly "structured to be self-sustaining." Id. at 49-50; see also id. at 37-38. In Brotherton, the Sixth Circuit denied sovereign immunity to a self-described "nonprofit, private corporation" with regional offices across 40 states. In doing so, the Court noted that while Ohio regulated the corporation pursuant to its general corporate law and a statute authorizing the performance of the corporation's mission–harvesting of corneas for transplant use–"it seems unlikely that Ohio has any financial involvement" with the corporation. Brotherton, 173 F.3d 552, 561. In a recent post-Ernst denial of sovereign immunity on state-liability grounds, the Circuit again emphasized the entity's near-exclusive reliance on private funds and the apparent absence of any state financial contribution to its activities. See Perry v. Southeastern Boll Weevil Eradication Foundation, No. 04-5537, 2005 WL 3051563, at *1-3 (6th Cir. Nov. 15, 2005) (unpublished).

On balance, HCDJFS hews more closely to the financial profile of those entities *granted* sovereign immunity on state-liability grounds than those denied immunity on such grounds. As the statutory discussion at Part III.B.2, infra, will elucidate, HCDJFS–while nominally a municipal or county agency–is, for purposes of the activities at issue in this case, an integral part of a state-conceived and directed distribution system for state and federal public assistance dollars. Like the judicial retirement entity granted immunity in Ernst, HCDJFS distributes (in part) state-funded benefits and therefore relies heavily on the state treasury to carry out its mission. See Ernst, 427 U.S. at 359-60. In contrast to the Ernst entity, which relied exclusively on the state treasury to finance its employee salaries and other overhead expenses, HCDJFS apparently draws some of its overhead from county and federal funds. Cf. Ernst, 427 U.S. at 360, and doc. #50 at 8-9. However, this distinction–in light of the other relevant facts–does not alter

14

the impression that HCDJFS' practical survival depends in large part on state financial support. See Hess, 781 F.2d at 227. The state-liability factor therefore weighs in favor of granting sovereign immunity to HCDJFS.

### 2. State Control of HCDJFS Activities and Officials

The Court next considers the extent to which the State of Ohio, through the operation of state laws, court decisions, and official appointments, directs HCDJFS' activities. The existence of a state statute creating an entity, or broadly authorizing that entity's activities, does not in itself render that entity an "arm of the state." See, e.g., Brotherton, 173 F.2d at 561; Perry, 2005 WL 3051563, at *3-4; doc. #29 at 8. Nor, to paraphrase Plaintiffs, does an entity's obligation to obey other general state and federal law relevant to its activities. (See doc. #29 at 8.) On the other hand, the existence of relatively "comprehensive state legislation" through which a state exercises "extensive and detailed control" over an entity will often support an extension of state sovereign immunity to that entity. Ernst, 427 F.3d at 360.

### a. State Statutes and Regulations

Much of the state legislation relevant to this case flows from the requirements of Title IV-D of the federal Social Security Act. County Defendants point to a series of interrelated federal and state statutory provisions which, they contend, show that the State of Ohio exercises relatively tight control over the Family First distributions at issue in this litigation.[17] Indeed,

_____

[17] County Defendants also cite to an October 2003 internal memorandum from the former Director of ODJFS, Tom Hayes, to the Directors and Administrators of County CSEAs. See doc. #30 at 3 (citing doc. #29, Ex. B). Internal administrative memoranda typically do not carry the force of law, and thus do not fall strictly within the ambit of the state-control analysis. However, the memorandum does appear to reinforce the notion that ODJFS regarded CSEAs as "arms" of a state child support distribution network. (See doc. #29, Ex. B (encouraging CSEA directors, in investigating child support claims, to "keep in mind" Ohio code provision establishing statute of limitations for certain actions "against the state *or an agency thereof*.")).

federal law makes clear that Ohio's own "*[s]tate* plan for child and spousal support" must itself

"provide" for distributions that comply with the Family First rules. See 42 U.S.C. §§ 654

(emphasis added), 654(5) (referencing 42 U.S.C. § 657). It is this same state plan that must "be in

effect in all political subdivisions of the State," with "financial participation by the State." 42

U.S.C. § 654. Ohio law expresses these federal mandates by establishing, in addition to ODJFS

itself, a series of county-level departments of job and family services and child support

enforcement agencies to serve as "*the* local Title IV-D agenc[ies]" within each county. See

O.R.C. §§ 329.01, 3125.10, 3125.11 (emphasis added), 3125.24. Some, though not all, of the

relevant Ohio code provisions expressly refer to these sub-state entities as "county" entities.[18]

See, e.g., O.R.C. §§ 307.98, 329.01.

Read in isolation, the Ohio code provisions cited above could describe purely local bodies

divorced from any meaningful state control. But read together, and in the context of the federal

Title IV-D provisions, they tend to reinforce County Defendants' contention that–as a functional

matter–HCDJFS and its equivalents in other Ohio counties form part of a tight, state-initiated and

directed network for the collection and redistribution of child support. Title IV-D mandates the

"establishment or designation of a single and separate organizational unit . . . within the State to

administer the [support] plan"–here, ODJFS–but does not describe any particular administrative

substructure within the state.[19] 42 U.S.C. § 654(3); see also 42 U.S.C. § 657 (prescribing, without

---

[18] The ODJFS-Hamilton County Partnership Agreement that guides County Defendants' activities also expressly refers to "county agencies." See docs. ##s 25 at 6 and 26, Ex. A at 1.

[19] The Court includes this Title IV-D language primarily for context, because–as previously noted–the state-control prong of the sovereign immunity inquiry focuses on *state* laws governing the relationship between a state and an entity seeking immunity. In any event, in this case, it would difficult to draw any firm conclusions from federal law alone. For example, Title IV-D expressly requires states to "provide for entering into cooperative arrangements with

reference to sub-state entities, rules for "State" child support collections and distributions).  The

Ohio Administrative Code section establishing "general operating principles" for Ohio's Title IV-

D program, see O.A.C. § 5101.1-29-31, is similarly bereft of references to a substructure.

The provisions cited above thus suggest that the State of Ohio could have satisfied the

federal requirement that a state Title IV-D plan be implemented in each "political subdivision" by

creating–in lieu of "County Departments of Job and Public Services"–"County *Branch* Offices"

of ODJFS.  However, because an agency by either name would be administering the same "*state*

plan for child and spousal support" within the borders of Hamilton County, see 42 U.S.C. §654

(emphasis added), the distinction is largely semantic.  The sovereign immunity analysis

emphasizes structural contrasts.  See, e.g., McMillian v. Monroe Cty., 520 U.S. 781, 793-95

(extending immunity to Alabama county sheriff and distinguishing, on grounds of interstate

structural variations in laws governing sheriffs, cases denying immunity to other sheriffs).

The administrative relationship between the State, as represented by ODJFS, and HCDJFS

is further described in state code provisions providing for the negotiation of "fiscal agreements"

between ODJFS, county boards of commissioners, and–where elected–the director of the relevant

county CSEA.[20]  See O.R.C. § 5101.21(B).  ODJFS and Hamilton County have such an

---

appropriate courts and law enforcement officials and Indian tribes or tribal organizations . . . to
assist the agency administering the plan . . . ."  42 U.S.C. § 654(8).  The absence of any
analogous reference to sub-state entities like HCDJFS suggests these entities are most naturally
regarded as part of "the agency administering the [state] plan."  42 U.S.C. §654(8).  On the other
hand, the same section later refers to "political subdivisions of the State" that may be engaged in
carrying out the plan.  42 U.S.C. § 654(22).  Other sections refer to both "State" *and* "local"
"units" charged with administering the Act.  See, e.g., 42 U.S.C. §§ 652 (a)(2), (a)(10)(A).

[20] The Court notes in passing that while County Defendants state that these provisions
"require" ODJFS to enter into such agreements," see doc. #25 at 6, the provisions appear to
stand only for the proposition that the ODJFS Director "*may* enter into one or more written fiscal
agreements . . . ."  O.R.C. § 5101.21(B) (emphasis added); see also § 307.98.

agreement, dubbed the "Partnership Agreement." (See doc. #25 at 6 and 26, Ex. A.) Contractual relationships between a state and local entity seeking sovereign immunity may cut against extension of immunity to the extent they reinforce the notion that the two entities transact at arms' length. See, e.g., Hess, 513 U.S. at 37-38. However, the instant provisions describe a much tighter bond. For instance, HCDJFS' public assistance awards must comply with financial methodologies adopted by ODJFS in the manner of "internal management rules." O.R.C. §§ 5101.21(B)(2) and (D); see also § 5101.21(B)(6)(b) and Partnership Agreement, doc. #26, Ex. A at 2-3. ODJFS must ensure that HCDJFS complies with "applicable state and federal [child] support regulations" including Title IV-D, and issue any requisite "policy interpretations regarding state and federal law" to HCDJFS. See O.R.C. § 3125.24; Partnership Agreement, doc. #26, Ex. A at 3. HCDJFS is then expected to enforce, pursuant to the Partnership Agreement, any relevant family services requirements established in state law, federal law, state gubernatorial order, or state-federal contract. See O.R.C. §§ 5101.21(B)(6)(a), 6(c) and (9); see also § 3125.11. This express and apparently exclusive state and federal enforcement mandate bolsters the conclusion that HCDJFS acts as an "agent of the state" in overseeing child support collections within the boundaries of Hamilton County.[21] See, e.g., McMillian, 520 U.S. at 790-91.

### b. State Court Decisions

---

[21] Here, in contrast to McMillian, HCDJFS and Burke's legal authority appears largely derivative of authority conferred on Hamilton County itself through the Partnership Agreement. Cf. McMillian, 520 U.S. at 790-91 (noting that Alabama sheriffs entitled to sovereign immunity possess certain state law enforcement powers not delegated to the sheriffs' host counties). This distinction does not counsel against a grant of sovereign immunity, however, because the statutes surveyed above suggest that Hamilton County itself–through HCDJFS–also acts as an "arm of the state" for purposes of the contested child support collections. In other words, even if the Court were to determine that Hamilton County should be substituted for HCDJFS in this action, the same sovereign immunity analysis would likely apply.

To conduct a full analysis of the state-control factor, the Court must also consider how Ohio *courts* have characterized the State's relationship to HCDJFS and analogous entities.  See Ernst, 427 F.3d at 359-60 (citing Hess, 513 U.S. at 45).  Unfortunately, Ohio case law is not particularly instructive.  Most Ohio cases applying immunity doctrines to CDJFSes and/or CSEAs involve claims under Chapter 2744, Section 2744.02 of the Ohio Revised Code, which this Court has already noted does not apply in 42 U.S.C. § 1983 actions.  Whereas state sovereign immunity extends to only those political subdivisions that constitute true "arms of the state," Section 2744.02 immunity generally insulates subdivisions from private damage claims so long the claims stem from proprietary or governmental functions.  See, e.g., Wilson, 63 N.E.2d at 107; see also Engleman v. Cincinnati Bd. of Ed., No. C-000597, 2001 WL 705575, at *2 (Ohio App. 1st June 22, 2001), and Ross v. Trumbull Cty. Child Support Enforcement Agency, No. 2000-T-0025, 2001 WL 114971, at *6-7 (Ohio App. 11th Feb. 9, 2001) (citing in part O.R.C. § 2744.02(A)(1)).

Because many political subdivisions that would not qualify as "arm(s) of the state" nevertheless enjoy Section 2744.02 immunity, the fact that CDJFSes and CSEAs are often classified as immune under Section 2744.02, see, e.g., Ross, 2001 WL 114971, at *6, does not explain whether–in the Ohio courts' eyes–HCDJFS and its Director should be entitled to state sovereign immunity.  Moreover, the Court is aware of only one modern Ohio Supreme Court decision, Brodie v. Summit Cty. Children Servs. Bd. et al., 554 N.E.2d 1301 (Ohio 1990), that directly addresses this question.[22]  In Brodie, the guardian of a minor child sued a County

---

[22] There are other Ohio Supreme Court cases that discuss the classification of entities like HCDJFS as "political subdivisions."  See, e.g., Butler v. Cuyahoga Cty. Dept. Of Human Servs., 740 N.E.2d 554, 570-71 (Ohio 2001); Burr v. Bd. of Cty. Comissioners of Stark Cty., 491 N.E.2d 1101, 1105 (Ohio 1986).  However, as in the above-referenced cases, these discussions do not occur in the context of state sovereign immunity.

Children's Services Board (CCSB), its executive director, and other staff, accusing them of negligently failing to respond to reports that the child had been abused. See Brodie v. Summit Cty. Children Servs. Bd. et al. ("Brodie I"), Nos. 13352, 13374, 1988 WL 114459, at *1 (Ohio App. 9th Oct. 26, 1988). The Ohio Supreme Court, relying primarily on its reading of the United States Supreme Court's decision in DeShaney v. Winnebago Cty. Dept. Of Social Servs., 489 U.S.189 (1989), refused to extend state sovereign immunity to defendants. Brodie v. Summit Cty. Children Servs. Bd. et al. ("Brodie II"), 554 N.E.2d 1301, 1305-06 (Ohio 1990).

Brodie is inapposite. In denying state sovereign or "absolute" immunity, the Ohio Supreme Court emphasized that the due process clause should not be used to create and impose "affirmative obligations" on the state where those obligations are not codified in law. Brodie II, 554 N.E.2d at 1305 (citing DeShaney, 489 U.S. at 194-97). Here, Plaintiffs contend that Defendants disregarded express federal mandates codified in the Family First provisions, as well as Plaintiffs' procedural due process rights, by over-withholding child support arrearages. The complaint thus alleges specific violations of federal statutory law,[23] not the generalized "negligence and misfeasance" at issue in Brodie.

Because the relevant Ohio statutory law reveals that the State enjoys significant control and oversight of HCDJFS' activities, and Ohio case law (while not instructive) does not directly undermine this conclusion, the second immunity factor generally supports extension of sovereign immunity to HCDJFS. In so concluding, the Court does not mean to endorse County Defendants' implication that they had no discretion whatsoever, as factual matter, to correct the alleged child support withholding errors at issue in this litigation. (See, e.g., doc. #30 at 4; doc. #50 at 8.) It

---

[23] For more discussion of this issue, see Part III.C.2, infra.

finds only that the State of Ohio, through ODJFS, exercises enough control over the HCDJFS

activities at issue in this litigation that the state-control factor points towards extension of

sovereign immunity to HCDJFS.

### 3. State Appointment of HCDJFS Officials

The third factor in the sovereign immunity analysis is the extent to which the state

legislature or state officials appoint the leadership of the entity seeking immunity.  See, e.g.,

Ernst, 427 F.3d at 359.  HCDJFS Director Burke is appointed by–and presumably also removable

by–Hamilton County's Board of County Commissioners, not the Ohio legislature, ODJFS or any

other state body.[24]  See O.R.C. § 329.01.  This fact cuts against granting sovereign immunity to

HCDJFS.  However, the Supreme Court has emphasized that where other relevant factors point

*towards* a grant of sovereign immunity to an entity, the fact that the entity's leader is not state-

appointed is not decisive.  See McMillian, 520 U.S. at 791-92.

### 4. HCDJFS' Performance of Traditional State Functions

The fourth and final sovereign immunity factor examines "whether the entity's functions

fall within the traditional purview of state or local government."  Ernst, 427 F.3d at 359.  There is

no question that absent preempting federal legislation, the State of Ohio–through its own agencies

and arms–may exercise its traditional police powers to promote family welfare.  See, e.g.,

Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 151 (2001).  But it is unclear that within our

Circuit, child support and public assistance services should be broadly classified as "traditional

---

[24] The parties have not described the appointment or hiring rules applicable to other
HCDJFS officials, but it seems unlikely that–if Director Burke is county-appointed–any of her
subordinates within HCDJFS would be state-appointed.

state functions" for state sovereign immunity purposes.[25]  *Cf., e.g.*, Hutsell, 5 F.3d at 1002 (higher

education); Ernst, 427 F.3d at 361 (provision of retirement benefits to state-court judges); Flint ex

rel. Flint v. Kentucky Dept. Of Corrections, 270 F.3d 340, 351 (6th Cir 2001) (incarceration); U.S.

v. Ohio Dept. Of Highway Safety, 635 F.2d 1195. 1200 (6th Cir. 1980) (vehicle registration) (all

classifying named services as "traditional state functions").

In its most recent published application of the state sovereign immunity test, the Sixth

Circuit indicated that an entity's receipt of funding from annual state legislative appropriations,

statewide operations, collaboration with the state treasury and state agencies, and direct service of

executive, judicial or legislative officials could all support a finding that the entity was engaged in

"a traditional state function."  Ernst, 427 F.3d. at 361.  HCDJFS receives some state funding, but

its operations are–for all practical purposes–apparently confined to Hamilton County.  See Parts

III.B.1 and 2, infra.  To the extent that it functions as ODJFS' Hamilton County arm, HCDJFS

arguably "serves a statewide *purpose*."  See Ernst, 427 F.3d at 365 (emphasis added).  However,

there is no  indication in the record or law that HCDJFS directly collaborates with or serves any

state officials or entities beyond the bounds of ODJFS.  The fourth or traditional state function

factor thus weighs weakly against a grant of sovereign immunity.

**5.      Application of Sovereign Immunity Bar to Plaintiffs' Claims**

This is one of those difficult cases where the "indicators of [state sovereign] immunity

point in different directions."  Hess, 513 U.S. at 45, 47.  In such circumstances, the trend of the

primary, or state-liability, factor is often decisive.  See, e.g., id. at 47-49. The Court has found

---

[25] The Supreme Court has suggested that enforcement of child support *orders* through the
state court systems is a traditional state function.  See Rose v. Rose, 481 U.S. 619, 628 (1987).
At least one other Circuit has suggested that the underlying child support collections are also
"traditional state functions."  See, e.g., U.S. v. Lakatos, 241 F.3d 690, 695 (9th Cir. 2001).

that the State of Ohio is potentially, if not necessarily, liable for any large monetary judgment levied against HCDJFS and Director Burke. See Part III.B.1, supra. One of the three remaining, secondary factors, State control of HCDJFS activities, also points towards a grant of immunity. See Part III.B.2, supra. The third or state-official factor points away from immunity, and the fourth or traditional-state-function factor points weakly away but does not greatly "advance [the Court's] Eleventh Amendment inquiry." Hess, 513 U.S. at 45; Parts III.B.3 and III.B.4, supra. On balance, therefore, the Court concludes that HCDJFS is an "arm of the state" entitled to sovereign immunity for purposes of the activities implicated in this action.

The Court's extension of state sovereign immunity to HCDJFS bars all Plaintiffs' claims against HCDJFS itself. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984). Because Plaintiffs' claims against Director Burke appear to derive purely from Burke's status as an HCDJFS officer or agent, sovereign immunity also bars those claims to the extent they seek retroactive monetary relief. Pennhurst, 465 U.S. at 102-03 (citing Edelman v. Jordan, 415 U.S. 651, 666-67 (1974)); Pusey, 11 F.3d at 657-68 and n.4. The Court therefore **GRANTS** County Defendants' motion for summary judgment as to the aforementioned claims. However, any claims for prospective relief that challenge the constitutionality of Director Burke's official actions are preserved under the Ex Parte Young exception to sovereign immunity. Pennhurst, 465 U.S. at 102; Order, doc. #34 at 6-7 (preserving same claims against ODJFS Director). This Court has already held that Plaintiffs' complaint–which does not distinguish between Defendants as to the scope of requested relief–appears to state such claims. See Order, doc. #34 at 6-7.[26] Indeed,

---

[26] For more discussion of this issue, see the Court's pending Order Granting in Part and Denying in Part Summary Judgment on motions of current ODJFS Director Riley and past Director Hayes (docket # pending).

the Court has already granted some injunctive relief against Burke.  <u>See, e.g.,</u> Order, doc. #46.

The Court must therefore evalute County Defendants' remaining summary judgment

claims to determine whether they bar prospective relief against Director Burke.

**C.     Failure to State a Claim Under 42 U.S.C. § 1983[27]**

County Defendants assert that they are entitled to summary judgment because Plaintiffs

have failed to state any claim upon which relief can be granted"[28] under 42 U.S.C. § 1983.  (Doc.

#25 at 13-18.)  They observe that § 1983 makes agencies, and by extension administrators like

Burke in their official capacities,[29] liable only for their implementation of official customs or

policies that violate federal statutory or constitutional law.  (Doc. #25 at 14-19; <u>see also</u> <u>Monell v.</u>

_____

[27] In addition to the arguments considered below, County Defendants assert that
Plaintiffs have failed to state a claim because HCDJFS and Director Burke constitute an arm of
the state and a state actor, respectively, and "neither a state nor its officials acting in their official
capacity" are "persons" under 42 U.S.C. § 1983 .  (<u>See</u> <u>Doc.</u> #25 at 13-14.)  This argument is
essentially co-extensive with County Defendants' claim, discussed at Part III.B, <u>infra</u>, that they
are entitled to sovereign immunity.  <u>See, e.g.,</u> <u>Howlett v. Rose</u>, 496 U.S. 356, 365 (1990) (<u>citing</u>
<u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58 (1989) (recognizing that "an entity with
Eleventh Amendment immunity is not a 'person' within the meaning of § 1983.").

[28] Like the personal jurisdiction argument discussed above, this is best characterized as a
claim for relief pursuant to Rule 12 of the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ.
Proc. 12(b)(6) (providing for dismissal for failure to state a claim).  Rule 12(b)(6) claims,
assuming they have not already been waived or dismissed,  may be incorporated into summary
judgment motions.  <u>See</u> Fed. R. Civ. Proc. 12(c).

[29] Because Plaintiffs' claims against HCDJFS and retrospective monetary claims against
Director Burke fail on independent (sovereign immunity) grounds, the Court analyzes County
Defendants' § 1983 arguments only as they apply to Plaintiffs' prospective claims against Burke,
an HCDJFS officer.  <u>See</u> Part III.B.5, <u>supra</u>.  However, because Burke is sued in her official
capacity, the Court must examine HCDJFS' activities, as well as the laws and regulations
governing HCDJFS and its parent agency ODJFS, to determine whether Plaintiffs properly state
a § 1983 claim against Burke.  <u>See, e.g.,</u> <u>Westside Mothers v. Haveman</u>, 289 F.3d 852, 860-61
(6th Cir. 2002) (acknowledging <u>Ex parte Young</u> "fiction" that permits prospective relief claims
against officers implementing challenged laws or policies on behalf of the state, while barring
suits against the state itself).

24

Dep't. of Social Services, 436 U.S. 658, 690-91 (1978)). They also note that not all violations of federal law are remediable in private § 1983 actions. See, e.g., Blessing v. Freestone, 520 U.S. 329, 340-41 (1997). County Defendants contend that Plaintiffs have failed to show either that Burke's alleged violations of federal law occur pursuant to any official agency policy or custom, or that these violations implicate any federal rights enforceable under § 1983. (Doc. #25 at 14-19.) The Court disagrees on both counts.

### 1. Violations Pursuant to Official Policy or Custom

As a threshold matter, plaintiffs seeking relief for an officer's violations of federal law under 42 U.S.C. § 1983 must show that those violations stem from some official agency policy or practice. See, e.g., Monell, 436 U.S. at 690-91; Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 105 (1989). Plaintiffs allege, in essence, that the various systems Defendants have used to track child support distributions under the Family First provisions and state law have erroneously calculated the child support payments due Plaintiffs under federal law. (Doc. #1 at 6 ¶¶ 11-17).[30] County Defendants do not dispute, and it is clear from the statutes and regulations discussed in the sovereign immunity analysis at Part III.B, supra, that tracking and distribution of child support payments are integral to the missions of both HCDJFS and its parent agency, ODJFS. Therefore, to the extent that Burke is currently engaged in any of the violations of federal law alleged by Plaintiffs,[31] the available facts strongly suggest that those violations

---

[30] See also pending Order Granting in Part and Denying in Part Summary Judgment on motions of current ODJFS Director Riley and past Director Hayes (docket # pending).

[31] It is unclear from the present record whether, or to what extent, HCDJFS and Burke have remained involved with the challenged calculation and distribution procedures since Ohio implemented its statewide SETS system. Plaintiffs allege that "[p]rior to the creation and full implementation of the State Disbursement Unit required by the Personal Responsibility and Work Opportunities Reconciliation Act, 110 Stat. 2105, 42 U.S.C. § 65(b), phased in between

flow from official HCDJFS or ODJFS policies or practices.[32]

### 2. Rights Specifically Enforceable Under § 1983

County Defendants also argue that Plaintiffs have not alleged violations of any federal rights enforceable against Burke under 42 U.S.C. § 1983. The Court briefly considered and rejected this argument in denying portions of a motion to dismiss on behalf of ODJFS' Director, and its prior order constitutes law of the case on this point. (See Order, doc. #34, 7-9 and n.3.) However, because the analysis underlying this question is relatively complex, the Court has concluded that it is worth revisiting in extended form here. Upon review, the Court again concludes that Plaintiffs have stated a claim to relief that is cognizable under § 1983.

Section 1983 creates a private cause of action against anyone who, under color of state law, deprives an individual of "any rights, privileges, or immunities secured by the Constitution

---

April 24, 2000 and October 1, 2005, the counties, rather than the State of Ohio, were required to collect arrearages and make distributions in accordance with the Family First" provisions, and that "[s]ignificant amounts of arrearage have yet to be dispersed by county departments of Jobs and Family Services throughout Ohio that were collected by the counties prior to the full assumption of that obligation by ODJFS on or before October 1, 2000." (Doc. #1 at 5-6, ¶ 10.) County Defendants have admitted that HCDJFS "*was*, at certain relevant times, charged with the collection of child support payments and the transmittal of same to ODJFS for distribution in accordance with the family first distribution rules of 42 U.S.C. § 657." (Doc. #1 at 5 ¶10; doc. # 14 at 2 ¶ 10) (emphasis added).

[32] On reply, County Defendants attempt to skirt this conclusion by implying that Plaintiffs' alleged calculation and distribution errors, to the extent any such errors have occurred, must stem from "mistakes" and "lapses in judgment" by individual, lower-level HCDJFS employees, rather than any official policy or practice "established or ratified" by Burke. (Doc. #30 at 6-7.) While this may be so, Plaintiffs' complaint–contrary to County Defendants' assertions–does not attribute the alleged violations to individual errors unsanctioned by HCDJFS and/or ODJFS. Rather, the most natural reading of Plaintiffs' complaint is that Defendants have, through their standard distribution practices and systems, negligently miscalculated the child support arrearages payable to Plaintiffs. County Defendants have not set forth any specific facts that support their version of events, let alone established that there is no genuine issue of material fact as to whether the violations stemmed from official policy or practice.

26

or laws" of the United States.  Blessing, 520 U.S. at 340; 42 U.S.C. § 1983.  While § 1983 actions may be used to remedy violations of both Constitutional and statutory law, they are available only where the alleged violations implicate specific federal *rights* recognized as privately enforceable under that section.  Gonzaga Univ. v. Doe, 526 U.S. 273, 279-80 (2002) (citing in part Maine v. Thiboutot, 448 U.S. 1, 4 (1980)).

As discussed above, Plaintiffs allege that Defendants' calculation and distribution of child support arrearages has violated and continues to violate the Family First provisions codified at 42 U.S.C. §§ 657(a)(1)(A) and (B) ("§ 657(a)").  See Part I, supra.  To determine whether violations of these provisions give rise to federal rights enforceable under 42 U.S.C. § 1983, the Court must find (1) that Congress intended the specific provisions at issue to benefit individuals like Plaintiffs; (2) that any rights allegedly established by the provisions and asserted by Plaintiffs are "not so 'vague and amorphous' that [their] enforcement would strain judicial competence;" and (3) that the provisions "unambiguously impose[] a binding obligation" on Burke.  See, e.g., Blessing v. Freestone, 520 U.S. 329, 340-41 (internal citations omitted).[33]  As discussed below, the first element of the Blessing test was refined and narrowed in Gonzaga University v. Doe, 526 U.S. 273 (2002).  See, e.g., Price v. City of Stockton, 390 F.3d 1105, 1109-10 (9th Cir. 2004).

County Defendants observe that Blessing, the case establishing the test for statutorily

---

[33] Even if these three initial elements are satisfied, "there is only a rebuttable presumption that the right is enforceable under § 1983."  Id. at 341 (internal citations omitted).  The Court must still dismiss a § 1983 action alleging violations of a federal statute it if finds Congress has "specifically foreclosed" § 1983 remedies by either "forbidding recourse to § 1983 in the statute itself," or "creating a comprehensive enforcement scheme that is incompatible with § 1983 actions."  Id.  Because the Supreme Court has already concluded that Congress did *not* specifically foreclose § 1983 remedies with respect to Title IV-D of the Social Security Act, the Court need not consider this final element here.  See, e.g., Westside Mothers, 289 F.3d at 863 (citing Blessing, 520 U.S. at 346-47.)

enforceable rights in § 1983 actions, concerned the same statute–Title IV-D of the Social Security

Act–at issue here.  (See doc. #25 at 16.)  In Blessing, the plaintiffs asserted that Title IV-D as a

*whole* conferred individually enforceable rights to have "all mandated services delivered in

substantial compliance with Title IV-D and its implementing regulations."  Blessing, 520 U.S. at

341.  The Supreme Court disagreed, finding that the broad "requirement that a State operate its

child support program in 'substantial compliance' with Title IV-D" did not constitute a federal

right.  Id. at 343.  In so holding, however, the Court did "not foreclose the possibility that *some*

provisions of Title IV-D give rise to individual rights" enforceable under § 1983, if a plaintiff

could "identify with particularity" the rights claimed.  Id. at 342, 345 (emphasis added).

Decisions applying Blessing in § 1983 actions under Title IV-D have thus focused on the

individual statutory provisions allegedly violated.  See, e.g., Clark v. Portage Cty., 281 F.3d 602

(6th Cir. 2002); see also Blessing, 520 U.S. at 346 (noting courts' obligation to break down

complaints and examine statutory allegations in their "most concrete, specific form.")

     In their complaint, Plaintiffs emphasize the following subsection(s) of Title IV-D, codified

at 42 U.S.C. § 657(a):

> (a) In general
> Subject to subsections (d) and (e) of this section, an amount collected on behalf of a
> family as support by a State pursuant to a plan approved under this part shall be
> distributed as follows:
>
> > (1) Families receiving assistance
> >
> > In the case of a family receiving assistance from the State, the State shall–
> > > (A) pay to the Federal Government the Federal share of the amount so
> > > collected; and
> > > (B) retain, or distribute to the family, the State share of the amount so
> > > collected.
>
> In no event shall the total of the amounts paid to the Federal Government and retained by
> the State exceed the total of the amounts that have been paid to the family as assistance by
> the State.

42 U.S.C. § 657(a).  As discussed earlier, the gravaman of Plaintiffs' complaint is that Defendants have miscalculated and over-withheld child support payments that should have been passed back to them under the terms of subsection § 657(a) and related provisions.  Plaintiffs note that the Blessing Court suggested, without expressly deciding, that a similar "pass through" requirement in an early version of § 657 could give rise to a federally enforceable right:

> [R]espondent Madrid alleged that the state agency managed to collect some support payments from her ex-husband but failed to pass through the first $50 of each payment, to which she was purportedly entitled under the pre-1996 version of § 657(b)(1).  Although § 657 may give her a federal right to receive a specified portion of the money collected on her behalf by Arizona, she did not explicitly request such relief in the complaint.
> In any event, it is not at all apparent that respondents sought any relief more specific than a declaration that their "rights" were being violated and an injunction forcing Arizona's child support agency to "substantially comply" with all of the provisions of Title IV-D.

Blessing, 520 U.S. at 345-46; see also doc. #29 at 14.

Plaintiffs here, unlike the Blessing plaintiffs, have focused their complaint on alleged violations of §657(a), in association with statutory and regulatory implementing provisions.  (See doc. #1 at 5, 10 (referencing §657(a)).)  Moreover, while Plaintiffs' complaint could be clearer on this point, it appears that the prospective injunctive or declaratory relief Plaintiffs seek in this case–unlike the relief sought by the Blessing plaintiffs–is primarily designed to remedy any further violations of §657(a) itself.  (See, e.g., doc. #1 at 13 (referring to "audit procedures") and doc. #74 (order granting preliminary injunction regarding audits).)

In this regard, Blessing itself suggests in *dicta* that the provisions of current § 657(a) create an enforceable federal right for purposes of § 1983.  On reply, County Defendants concede that "if this [C]ourt concludes that HC[D]JFS is an arm of the state, then to the extent plaintiffs seek prospective relief against Suzanne Burke in her official capacity, such a claim *may* be

proper."  (Doc. #30 at 8 (emphasis added).)  However, because <u>Blessing</u> does not decisively

resolve this question–and the Court is not aware of any controlling, post-<u>Gonzaga</u> authority that is

squarely on point[34]–the Court must apply the <u>Blessing</u> factors to Plaintiffs' statutory claims.

### a.    Intended Beneficiaries

The Court first considers whether Plaintiffs are intended beneficiaries of the Family First

provisions codified at 42 U.S.C. § 657(a).  In <u>Gonzaga v. Doe</u>, the Supreme Court emphasized

that the relevant statutory "text must be phrased in terms of the persons benefitted."  <u>Gonzaga</u>,

536 U.S. at 284.  The Court then applied this requirement to find that provisions of the Family

Educational Rights and Privacy Act (FERPA) prohibiting federally funded educational

institutions from releasing personal records to unauthorized parties did not give rise to a federal

right enforceable under § 1983.  <u>See</u> <u>id</u>. at 276, 287-89.  In so holding, the Court emphasized that

the relevant provisions were phrased in terms of the regulated institutions and their internal

policies and practices, rather than in terms of the "individual entitlement[s]" of the students or

parents served by those institutions.  <u>Id</u>. at 287 (internal quotations omitted) (discussing 20 U.S.C.

§§ 1232g(b)(1)-(2)).  It interpreted the provisions as speaking "in terms of institutional policy and

practice, not individual instances of disclosure," and thus having an "aggregate" focus removed

from the "needs of any particular person."  <u>Id</u>. at 288 (internal quotations omitted).  The Sixth

Circuit applied <u>Gonzaga</u> to conclude that a provision of the Help America Vote Act (HAVA)

---

[34] The Sixth Circuit's decisions in <u>Clark v. Portage County</u> and <u>Westside Mothers v.</u>
<u>Haveman</u>, discussed in the papers, predated <u>Gonzaga</u>.  Moreover, <u>Clark</u> focused on a different
provision of Title IV-D, and <u>Westside Mothers</u> on an entirely different statute. <u>See</u> <u>Clark</u>, 281
F.3d at 604 (discussing 42 U.S.C. §§ 654(4)(B) and (8) and associated regulations) and <u>Westside</u>
<u>Mothers</u>, 289 F.3d at 863 (discussing 42 U.S.C. 1396a(a)(10)(A) of the Medicaid Act). Thus,
while these decisions are instructive on the second and third prongs of the <u>Blessing</u> test (those
not explicitly altered in <u>Gonzaga</u>), neither controls here.

regulating the casting of provisional ballots *is* enforceable under § 1983.[35]  See generally

Sandusky Cty. Democratic Party v. Blackwell, 387 F.3d 565, 568, 572-73 (6th Cir. 2004).  The

Court found that the HAVA subsection beginning "[a]n 'individual shall be permitted to cast a

provisional ballot'" constituted "unambiguous" "rights-creating" language, unlike the passive,

institutionally worded FERPA disclosure provisions.  See id. at 572-73 (discussing 42 U.S.C. §

15482(a)(2)).

Section 657(a) of Title IV-D falls between those statutes' extremes in both structure and

wording.  Defendants correctly observe that section 657 as a whole, like the FERPA section

analyzed in Gonzaga, appears primarily concerned with the institutional practices of state and

local entities receiving federal funding.  (Doc. #25 at 17.)  On the other hand, the language of

subsection 657(a) is considerably more focused on the needs and entitlements of individual

parties–or in this case, families on public assistance–than the contested portion of FERPA.  The

introductory paragraph describes the funds as "collected on behalf of a family" on public

assistance, the internal subsection is entitled "families receiving assistance," and there are several

internal references to such families in the body of the rather short provision.  Section 657(a)'s

greater emphasis on individual needs is hardly surprising, given that the section concerns

monetary property (in the form of child support collections owed to families), rather than the

more abstract privacy entitlements at issue in FERPA.  The individual focus is not as pronounced

as in the HAVA provision cited in Sandusky County, which treats the individual voter as the

---

[35] As noted above, the Sixth Circuit decided Clark v. Portage County, which in any event involved a different provision of Title IV-D, before Gonzaga was handed down.  The Eighth Circuit has analyzed § 657(a) since Gonzaga and concluded–unfortunately without elaboration–that it "reflects some congressional intent to benefit custodial parents" sufficient to satisfy the first Blessing prong.  See Walters v. Weiss, 392 F.3d 306, 312-313 (8th Cir. 2004).

subject rather than the object of the statutory text, but it is undeniably present.

On balance, and particularly in light of the Supreme Court's focused *dicta* in <u>Blessing</u>, the Court concludes that § 657(a) is sufficiently focused on the needs of individual public assistance recipients like Plaintiffs to satisfy the first prong of the <u>Blessing</u> test.

### b. Definite or "Vague and Amorphous" Standards

The Court next considers whether any federal rights otherwise inherent in § 657(a) are nonetheless too "vague and amorphous" to be amenable to enforcement in a § 1983 action.  In <u>Clark v. Portage County</u>, the Sixth Circuit held that the following provisions of Title IV-D, codified at 42 U.S.C. § 654, were "vague and amorphous":

> A State plan for child and spousal support must–
>
> > (4) provide that the State will–
> >
> > > (B) enforce any support obligation established with respect to
> > >
> > > > (i) a child with respect to whom the State provides services under the plan; or
> > > >
> > > > ii) the custodial parent of such a child;
> > > >
> > > > \* \* \* \* \* \*
> >
> > (8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title, the agency administering the plan will establish a service to locate parents utilizing–
> >
> > > (A) all sources of information and available records; and
> > >
> > > (B) the Federal Parent Locator Service established under section 653 of this title,
> >
> > and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections[.]

<u>Clark v. Portage Cty.</u>, 281 F.3d 602, 604 (6th Cir. 2002) (citing 42 U.S.C. §§ 654(4)(B) and (8)).

The Court noted that the cited sections, and associated regulations establishing guidelines for

locating parents and mandating creation of an "effective system" for monitoring child support compliance, "do not make it clear whether an individual right would arise based on the alleged inadequacy of the state plan's wording or from a deficiency in the enforcement efforts of the agency." Id. at 605.  The Court analogized these requirements to the "substantial compliance" standard rejected as a basis for § 1983 enforcement in Blessing, reasoning that "simple lack of effectiveness in enforcing support obligations does not alone give rise to an individual right," and that the state and its officers should not be subject to liability for "some uncertain standard not delineated in the statute." Id. at 605 (citing Blessing, 520 U.S. at 335-36).

The Family First distribution requirements codified at § 657(a) of Title IV-D are considerably more definite than the Title IV-D requirements at issue in Clark.  Section 657(a) clearly states that "[i]n no event shall the total of the amounts paid to the Federal Government and retained by the State exceed the total of the amounts that have been paid to the family as assistance by the State." 42 U.S.C. 657(a).  The Court does not doubt that from an administrative perspective, it may be difficult for Burke and other state officers to ensure that this rule has been perfectly observed with respect to each public assistance recipient.  Nonetheless, the cited provision appears to establish–as a matter of statutory interpretation–a clear standard for compliance.[36]  Section 657(a) is arguably far clearer than the extensive Medicaid Act screening and treatment requirements at issue in Westside Mothers v. Haveman, which–according to the Sixth Circuit–also confer federal rights enforceable under § 1983.  See Westside Mothers v. Haveman, 289 F.3d 852, 863 (6th Cir. 2002) and 42 U.S.C. § 1396a(a)(10)(A).  Plaintiffs'

---

[36] The Court acknowledges that the Eighth Circuit recently concluded that § 657(a) is "too vague and amorphous" for judicial enforcement.  See Walters, 392 F.3d at 313.  Unfortunately, there is no analysis of this holding, and this Court does not find it persuasive in light of the plain wording of this portion of the statute.

complaint thus satisfies the second prong of Blessing.

### c.       Binding State Obligation

Last, the Court must consider whether § 657(a) imposes a "binding obligation" on the

State and its officers.  In analyzing this factor, the Sixth Circuit has emphasized that the federal

provisions at issue should be "couched in mandatory, rather than precatory, terms."  Sandusky

Cty., 387 F.3d at 573 (citing Blessing, 520 U.S. at 341); Westside Mothers v. Haveman, 289 F.3d

852, 863 (6th Cir. 2002).  The inclusion of words like "shall" and "must" often, if not always,

supports a finding that a particular statutory provision binds the state.  See, e.g., Westside

Mothers, 289 F.3d at 863 (Medicaid services "shall be furnished"); Sandusky Cty., 387 F.3d at

572-73 ("individual shall be permitted"); see also Gonzaga, 536 U.S. at 279 (emphasizing

statutory use of "shall" in rights-creating statutes).  Section §657(a) is replete with "shalls", and

there is no apparent reason to conclude that it does not bind the state or, by extension, Burke.

In sum, the Court finds that Plaintiffs have alleged a violation of a federal statutory right[37]

---

[37] For the sake of completeness, the Court notes in passing that it is unclear whether
Plaintiffs state any claim to constitutional relief under § 1983 that is *independent* of their claim
to relief under 42 U.S.C. §657(a)–a question not directly addressed in the Court's prior order.
(See doc. #34 at 7-9.)  County Defendants suggest that all Plaintiffs' claims are entirely
derivative of their §657(a) claim.  (Doc. #30 at 7.)  Plaintiffs allege that Defendants have
violated their "procedural due process rights," and their complaint seeks a declaration that
Defendants have violated and continue to violate "the Constitution *and* laws of the United
States."  (Doc. #1 at 10, 13) (emphasis added)).  However, the substance of Plaintiffs' due
process claim, as stated in the complaint, appears to be that Defendants have violated property
rights "created by federal statutes and regulations, including but not limited to 42 U.S.C.
657(a)."  (Doc. #1 at 10 ¶ 36.) (Plaintiffs' complaint specifically alleges violations of only §
657(a)).  Plaintiffs also claim that Defendants have violated a "common-law fiduciary duty" to
Plaintiffs, but do not elaborate on the origins of this duty or explain how it relates to their
procedural due process claim.  (See doc. #10 at ¶ 37.)  Because the parties have not adequately
briefed the threshold question of whether Plaintiffs state an independent claim for constitutional
relief, let alone the secondary question of whether such a claim would have any independent
significance in the context of purely prospective relief against Burke, the Court declines to

enforceable under 42 U.S.C. § 1983, and thus **DENIES** County Defendants' claim for relief on this particular ground.

### D. Statute of Limitations

County Defendants' final contention is that Plaintiffs' claims against HCDJFS and Director Burke are time-barred. (Doc. #25 at 12-13.) Again, because sovereign immunity bars all Plaintiffs' claims against HCDJFS, as well as Plaintiffs' claims for retrospective monetary relief against Burke, the Court need consider this argument only in the context of Plaintiffs' residual, prospective claims against Director Burke. See Part III.B.5, supra. As the Court recognized in denying a similar prayer for relief on behalf of the ODJFS Director, the other Defendant remaining in this case, the statute of limitations has not run as to such claims. (See Order, doc. #34 at 9-10.) The Court **DENIES** County Defendants' claim for relief on this ground.

//

//


IV.     **CONCLUSION**

For the reasons above, HCDJFS and HCDJFS Director Suzanne Burke's joint Motion for Summary Judgment (doc. #25) is **GRANTED IN PART** as to all of Plaintiffs' claims against HCDJFS itself, as well as to Plaintiffs' claims for retrospective monetary relief against Director Burke. The Motion is otherwise **DENIED**.

IT IS SO ORDERED.

_____

decide these issues at the present time.

                                                                                 \_\_\_\_s/Susan J. Dlott\_\_\_\_

Susan J. Dlott
United States District Judge